UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:16-MJ-02428-BPB-1 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| CHRISTIAN BEGAY, | ) | Tuesday, May 31, 2016 |
| | ) | |
| Defendant. | ) | (9:58 a.m. to 10:22 a.m.) |


PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE WILLIAM P. LYNCH,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            ELAINE RAMIREZ, ESQ.
                         U.S. Attorney's Office
                         District of New Mexico
                         P.O. Box 607
                         Albuquerque, NM 87103


For Defendant:           DANIEL J. TALLON, ESQ.
                         6 Placitas West Road
                         Placitas, NM 87043


Court Reporter:          Recorded; Liberty - Gila

Clerk:                   E. Hernandez

U.S. Pretrial/Probation: S. Avila-Toledo

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>INDEX</u>

| <u>GOVERNMENT'S WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| LANCE ROUNDY | 3 | 9 | | |

<u>RULING</u>    21

1    **Albuquerque, New Mexico; Tuesday, May 31, 2016; 9:58 a.m.**

2                        **(Call to Order)**

3              **THE CLERK:**  *The United States of America versus*

4    *Christian Begay*.

5              **THE COURT:**  All right.  Would you like to then begin

6    with the prelim?

7              **MR. TALLON:**  Yes, your Honor, great.  Thank you.

8              **THE COURT:**  Do you have a witness to call, Counsel?

9              **MS. RAMIREZ:**  Your Honor, the United States would

10   call FBI Special Agent Lance Roundy.

11             **THE COURT:**  Great.  If you could come forward,

12   please, sir.

13             **THE CLERK:**  Please raise your right hand.

14            **LANCE ROUNDY, GOVERNMENT'S WITNESS, SWORN**

15             **THE CLERK:**  Please have a seat.  State your name and

16   spell your last name for the record.

17             **THE WITNESS:**  Lance Roundy, last name is R-o-u-n-d-y.

18             **MS. RAMIREZ:**  May it please the Court?

19             **THE COURT:**  You may proceed, Counsel.

20             **MS. RAMIREZ:**  Thank you.

21                      **DIRECT EXAMINATION**

22   **BY MS. RAMIREZ:**

23   Q    Sir, where are you employed?

24   A    I'm employed as a Special Agent with the FBI.

25   Q    And how long have you been employed with the FBI?

1  A    Oh, since September of 2008.

2  Q    And did you attend any particular law enforcement

3  academies or any particular training to prepare you?

4  A    Yes, I attended the FBI Academy at Quantico, Virginia.

5  Q    All right.  And as part of your primary duties with the

6  FBI, do you collaborate with State and local law enforcement

7  agencies?

8  A    I do, yes.

9  Q    All right.  And does that include for crimes that occur in

10 Indian Country?

11 A    Yes.

12 Q    All right.  Can you please tell the Court what occurred on

13 May 21st, 2016?

14 A    May 21st, 2016, we learned that a shooting occurred that

15 evening in Shiprock, New Mexico and we also was able to

16 identify witnesses to the shooting and conduct interviews.

17 Q    Okay.  Let me stop you there real quickly.  Shiprock,

18 New Mexico, is that within the exterior boundaries of the

19 Navajo Nation?

20 A    Yes, it is.

21 Q    All right.  And did you actually learn of the shooting the

22 following day on the 22nd?

23 A    We did, yes.

24 Q    All right.  But approximately what time did the shooting

25 occur?

1  A    At approximately (indiscernible).

2  Q    On the 21st?

3  A    Yes.

4  Q    All right.  And what was relayed to you with regard to

5  what happened on May 21st?

6  A    It was relayed to us that on May 21st at approximately

7  10:00 p.m., a blue-colored SUV arrived at the south nonprofit

8  housing area in Shiprock and arrived at the residence of 1036

9  in that housing unit.

10  Q    All right.  And who were the occupants of that vehicle?

11  A    The occupants -- the driver was identified as

12  Mr. Christian Begay and the female was -- the passenger is

13  identified as a female.

14  Q    All right.  Okay.  And did either of the occupants of the

15  vehicle exit the vehicle?

16  A    To what we learned, no, they did not.

17  Q    All right.  What happened?

18  A    The driver of the blue SUV engaged in conversation with a

19  female just outside of 1036.

20  Q    And what was the nature of the conversation?

21  A    The nature of the conversation was the driver of the

22  vehicle identified as Mr. Begay was alleging that another

23  individual owed him money and that he wanted to speak to that

24  individual.

25  Q    All right.  And you indicated that there was a person

1    outside of the residence that you identified as Jane Doe.  Did

2    Jane Doe identify Mr. Begay?

3    A    Yes, she did.

4    Q    All right.  And Mr. Begay asked to speak to someone else

5    at the residence?

6    A    That's correct, yes.

7    Q    All right.  And what happened then?

8    A    Based on an interview with Jane Doe, she had mentioned

9    that she engaged in conversation with Mr. Begay.  Mr. Begay had

10   told her that an individual owed him money and then based on

11   Ms. -- on Jane Doe's account, Mr. Begay pointed a firearm

12   described as a handgun at her and requested to speak to an

13   individual and at that point, Jane Doe went inside the

14   residence of 1036.

15   Q    All right.  And the -- what happened after Jane Doe

16   entered the residence?

17   A    Another individual, a female, exited the residence and

18   engaged in conversation with the driver of the SUV.  That

19   individual also identified the driver to be Mr. Begay.

20   Q    All right.  And what did Mr. Begay tell Jane Doe 2?

21   A    It was the same topic of conversation, that an individual

22   owed him money and Jane Doe 2, the other individual, had

23   offered to pay Mr. Begay the amount alleged to be owed.

24   Q    Did he accept that?

25   A    No, he did not.

1   Q    All right.  At some point, did the actual individual owing

2   -- or allegedly owing the money to Mr. Begay present himself?

3   A    He did, yes.  A short time after, he presented himself to

4   the driver of the vehicle and during an interview, he -- the

5   individual also identified Mr. Begay as the driver of the blue

6   SUV.

7   Q    All right.  And the victim in this case -- or the person

8   owing the money, I guess, at this point -- did they -- did he

9   engage in conversation with Mr. Begay?

10  A    Yes, they did.

11  Q    And what was the nature of that conversation?

12  A    The nature of the conversation was them arguing back and

13  forth about the amount owed and whether or not the amount -- or

14  whether or not the individual owed Mr. Begay the money.

15  Q    All right.  And what did Mr. Begay do in response the

16  argument?

17  A    In response to the argument, he brandished a handgun and

18  fired off two -- approximately two rounds from that handgun.

19  Q    All right.  And did those two rounds -- either of those

20  two rounds strike the victim?

21  A    Yes.

22  Q    And where at?

23  A    It hit the individual or the victim in the torso.

24  Q    All right.  And after the shooting, what did Mr. Begay do?

25  A    Based on witnesses, Mr. Begay fled the scene in the blue-

1  colored SUV.

2  Q    All right.  And was the victim hospitalized?

3  A    Yes.

4  Q    All right.  And was there a discussion with medical staff

5  as to the nature of (indiscernible)?

6  A    Yes.

7  Q    And what was it?

8  A    He had suffered what they determined to be a gunshot wound

9  to the torso.  The bullet had missed the vital organs in his

10 torso and from what medical staff told me that the bullet had

11 hit the pelvis bone and caused damage to that area.

12 Q    Okay.  Did law enforcement conduct a search of the scene

13 of the incident?

14 A    Yes.  They located approximately two spent 10 mm bullet

15 casings.

16 Q    All right.  And where were they located?

17 A    They were located outside the residence of 1036.

18 Q    All right.  And was there, I guess, an investigation

19 conducted of the neighbors?

20 A    Yes.

21 Q    And what did that investigation --

22 A    That many of the neighbors -- the nearby neighbors

23 recalled hearing two noises that they described as being

24 gunshots that evening.  They also recalled hearing a short time

25 after the gunshots an individual with a male voice screaming on

1  the ground and then they -- several of the neighbors also

2  recalled seeing a blue-colored SUV departing the area.

3  Q    All right.  And is Mr. Begay an enrolled member of the

4  Navajo Nation?

5  A    Yes.

6  Q    All right.

7        **MS. RAMIREZ:**  I'll pass the witness, your Honor.

8        **THE COURT:**  Thank you.

9                        **CROSS EXAMINATION**

10  **BY MR. TALLON:**

11  Q    Mr. Roundy, how do you spell your last name?

12  A    It's R-o-u-n-d-y.

13  Q    Did you meet any of the individuals that you referred to,

14  Jane Doe 1, Jane Doe 2 and MG?

15  A    Yes, I did.

16  Q    Okay.  Did you personally interview any of those three

17  people?

18  A    I did, all three of them, yes.

19  Q    And when you used the phrase that, "Many of the neighbors

20  were contacted concerning whether they'd seen anything" and you

21  indicated a variety of observations made by neighbors, how many

22  neighbors made those observations?

23  A    I don't recall off the top of my head right now.  If I had

24  to put an approximate number, there was about six individuals

25  that were contacted.

1   Q    Okay.  Approximately six --

2   A    Yes.

3   Q    -- would be the equivalent of using the word "many" in

4   this case?

5   A    Yes.

6   Q    Okay.  Was there any light -- special lighting at the

7   location at which this occurred?

8   A    Not to my knowledge, no.

9   Q    All right.  Could you describe the area where this

10  shooting took place?

11  A    It's -- like I said, it was south nonprofit housing area

12  in Shiprock.  The houses are all constructed approximately

13  anywhere from, I would say, about 40 feet to 60 feet from each

14  other and there was probably approximately about 20 to 25

15  housing units within that area.

16  Q    Okay.  And in the complaint, it makes reference to a

17  storage unit somehow in the vicinity of the house where this

18  took place -- the house is 1036 and then there appears to be a

19  storage unit near it?

20  A    Yeah, the storage unit is actually attached to the

21  structure itself.  As you walk out the front door, it would be

22  just to your right.  There is a storage unit.  I'm not sure

23  about how big it is but there's a storage right there attached

24  to the same unit.

25  Q    Okay.  But you can't describe how big it is?

1  A    I mean, I can give an approximate.  I -- no, I haven't had

2  a chance to measure it but it's probably about 10 feet by 15

3  feet.

4  Q    Okay.  So this unit is located to the right of the front

5  door of House Number 1036.  Where was the SUV when the shooting

6  took place?

7  A    Based on the witnesses, the SUV had pulled up and it was

8  just in front of the house.  So as you'd pull up -- if you were

9  to walk out the front door, it would have been on your left-

10  hand side.

11  Q    All right.

12  A    And there's a little patio -- concrete patio just out the

13  front door there.

14  Q    All right.  Would the SUV have been pointing towards that

15  storage unit?

16  A    No.  It would have been actually parallel with the doors

17  of the storage unit.

18  Q    Okay.  Which side would be parallel, the driver's or the

19  passenger's side?

20  A    Based on the witnesses, they had indicated that it was the

21  driver's side that was parallel to it.

22  Q    So from reading the complaint -- and it was written by an

23  Agent Wright (phonetic), correct?

24  A    Yes.

25  Q    It seems to me that there was a sequence of events where

1   someone spoke to Jane Doe 1.  Someone spoke to Jane Doe 2 after

2   Jane Doe 2 came out of the house and then MG actually has an

3   argument with Mr. Begay.

4   A    Yes.

5   Q    Is that the sequence?  So am I correct in understanding

6   that during this sequence that Mr. MG was concealed within the

7   storage unit?

8   A    That's what -- based on the interviews, that was what we

9   were told, yes.

10  Q    All right.  And do you know how much time the discussions

11  took place between the driver of the car and Jane Doe 1 and

12  Jane Doe 2?  Do you have any concept in time?

13  A    I know that the -- I don't have a specific time but the

14  general time was probably anywhere between a few minutes to

15  maybe five, ten minutes.

16  Q    Was MG interviewed about what went on that night or was he

17  capable of being interviewed because of medical reasons?

18  A    Yes, I interviewed him and he had indicated that he was

19  capable of understanding the previous events.

20  Q    Okay.  Did you ask him what he was doing in the storage

21  unit while the SUV was outside?

22  A    I did, yes.

23  Q    And what was he doing?

24  A    He basically said that when he saw the car come up, he

25  didn't want to speak.  He knew who it was that was pulling up

1    to his house, didn't want to talk to him.  So he inserted

2    himself in the storage to avoid --

3    Q    All right.

4    A    -- conversation.

5    Q    Okay.  Did you ask MG whether or not he was armed?

6    A    I did not, no.

7    Q    You didn't ask him?

8    A    I didn't, no.

9    Q    Okay.  So you say, "I did not, comma, no"?  Is that your

10   answer?

11   A    Yes, I did not ask him if he was armed.

12   Q    Okay.  In the complaint, it references that MG exited the

13   storage unit and confronted Begay.  That's what's written in

14   the complaint.

15   A    Uh-huh.

16   Q    Can you tell me about what the nature of that

17   confrontation was by MG?

18   A    Based on the interview with MG, it was over the

19   allegations of all the money owed to Mr. Begay.  MG also made a

20   reference to the fact that Mr. Begay talking to one of the

21   female Jane Does was a close relative of his and he didn't like

22   the way the conversation went between that person and

23   Mr. Begay.

24   Q    Which conversation didn't he like, the one with --

25   A    With Jane Doe 2.

1  Q    -- Jane Doe 2?  Is Jane Doe 2 MG's mother?

2  A    Yes.

3  Q    Was there any concern -- the -- did MG have any concern

4  about the conversation between Mr. Begay and Jane Doe 1?

5  A    Not that he indicated to us, no.

6  Q    So is it your understanding from your interview with MG

7  that he was concealed within the storage unit for a period of

8  time of perhaps up to ten minutes but he exited the storage

9  unit to confront, according to the complaint, Mr. Begay and

10 that confrontation was at least in part motivated by the tenor

11 of the conversation between Begay and Jane Doe 2, his mother?

12 A    Yes, that's my understanding.

13 Q    Was MG angry?  Did he tell you whether or not he was angry

14 when he came out of the storage unit?

15 A    He said he was angry, yeah, that the -- basically he had

16 mentioned, you know, the tone of the conversation and obviously

17 he was upset over the allegations as well -- or the allegation.

18 Q    What was the allegation?

19 A    Over the money that he allegedly owed.

20 Q    The allegation that he owed -- he was --

21 A    Yeah.

22 Q    -- he owed $30?

23 A    Yeah.

24 Q    And during this entire incident, did MG tell you that

25 Mr. Begay stayed within the car?

1  A    He did, yes.

2  Q    Did -- and you didn't ask whether or not MG had any sort

3  of weapon of any kind?

4  A    I asked him if he had confronted him and made any threats

5  to which Mr. -- or to which MG said he did not.

6  Q    Did you ask him specifically about a range of weapons, not

7  just, did you have a gun but did you have any other type of

8  weapon, even a rock?  Did you ask him anything like that?

9  A    No, I did not.

10 Q    Where did this interview with MG take place?

11 A    It was in the hospital.

12 Q    Was that sometime after his surgery?

13 A    It was -- I don't recall any surgery right now but it was

14 the following morning.  It would have been May 22nd.

15 Q    All right.  At about what time?

16 A    It was approximately 10:00 a.m.

17 Q    All right.  Did MG appear to be comprehending your

18 questions when you had that interview with him?

19 A    Yes.

20 Q    About how long did that interview go on?

21 A    Approximately 20 minutes.

22 Q    So you didn't end that interview because he was in pain or

23 anything like that?  He was capable of conducting a 20-minute

24 interview with you and answering your questions?

25 A    We did not end it because of his pain and he finished the

1   interview without any -- indicating any inabilities or -- to

2   continue.

3   Q    Okay.  In your testimony, you stated that Mr. Begay was

4   driving a blue SUV and that he fled the scene.  When was he

5   apprehended?

6   A    He was apprehended on the 26th of May.

7   Q    And where did that occur?

8   A    That occurred at the Sandoval Regional Medical Center in

9   Rio Rancho.

10  Q    And how did it come to be that you found Mr. Begay there?

11  A    We got --

12         **THE COURT:**  What's the relevance of this to probable

13  cause?

14         **MR. TALLON:**  Well, I don't know if he suffered some

15  injury in the event on May 21st, your Honor.  I find it

16  peculiar that the agents would locate Mr. Begay at a medical

17  center approximately a hundred and fifty or 200 miles from

18  where this took place.

19         **THE COURT:**  It doesn't go to probable cause.  I'm not

20  going to allow the questioning.  Stick to probable cause.

21  **BY MR. TALLON:**

22  Q    Were there any identification procedures conducted between

23  May 21 and May 26 that led you to believe that this shooting

24  was committed by Christian Begay?

25  A    Yes.  We obviously conducted the interviews in which

1  people had identified him as Christian Begay, the shooter.  We

2  also coordinated with the Criminal Investigation Office with

3  the Navajo Nation.

4  Q    Well, and when I say "identification procedures," were any

5  of these individuals shown photographs to verify that they

6  actually knew who Christian Begay was?

7  A    Yes.  The Criminal Investigations Office had identified

8  him and knew who he was.  We also coordinated with the Navajo

9  Nation Police Department.

10 Q    Okay.  You're saying that CID identified him and the

11 Navajo Nation helped in coordinating this but did any of the

12 specific witnesses that you mentioned -- I guess the ones I'm

13 most interested in would be MG, Jane Doe 1 and Jane Doe 2.

14 Were they -- how was it determined that they had actually seen

15 this man here shoot MG?

16 A    They weren't shown any photographs.  They'd indicated that

17 they were close relatives to him.

18 Q    Okay.  The blood --

19 A    So they had previous encounters with him.

20 Q    Okay.  Previous encounters or close relatives?

21 A    Well, they had both.  Being close relatives, they had had

22 previous encounters.

23 Q    Okay.  Just -- and they could be -- by "encounters," they

24 could be positive encounters; is that correct?

25 A    Yeah, yeah, uh-huh.  That's correct.

1   Q    Do you know the nature of the relationship -- the close

2   relative relationship?

3        **MS. RAMIREZ:**  I'm not really sure why that goes to

4   probable cause.

5        **THE COURT:**  Yeah, I'm lost here, Counsel.

6        **MR. TALLON:**  Okay.

7        **THE COURT:**  Let's move on.

8   **BY MR. TALLON:**

9   Q    Are the -- is -- are Mr. MG's -- what is his current

10  medical status?

11  A    This morning I was notified that he had been discharged

12  from the hospital and I haven't had a chance to follow up with

13  him on his status at the moment.

14  Q    All right.  Do you know the date of the discharge?

15  A    I do not know.

16       **THE COURT:**  All right.  Counsel, what part of

17  probable cause does that go to?

18       **MR. TALLON:**  I'll withdraw the question.

19       **THE COURT:**  Would you explain -- yeah, well, don't

20  just withdraw it.  If you can't stick on probable cause, you're

21  done.  Okay?

22       **MR. TALLON:**  Okay.

23       **THE COURT:**  So ask him about probable cause or tell

24  me you're done.

25  //

1   **BY MR. TALLON:**

2   Q    Was there any firearm located -- no, was the -- was the --

3   you indicated that there were 10 mm casings found at the scene.

4   Was there any identification of a 10 mm firearm to Christian

5   Begay in any way --

6   A    Um --

7   Q    -- either through finding it or being discussed in

8   relation to him?

9   A    To date, no, we have not found a firearm.

10  Q    But I think part of my question is, was there any -- not

11  whether you found the firearm but was there any association

12  uncovered during your investigation that associated a 10 mm

13  firearm with Christian Begay as the owner or possessor of that

14  firearm?

15          **THE COURT:**  You mean other than eye witness testimony

16  from Jane Doe 1 and Jane Doe 2?

17          **MR. TALLON:**  Well, I'm asking specifically about a

18  firearm.  That instrument which appears to have been from the

19  evidence collected at the scene a 10 mm firearm.

20          **THE COURT:**  I think he testified he -- your client

21  pointed a gun at Jane Doe 1 and Jane Doe 2.  So that's what

22  you're asking about?

23          **MR. TALLON:**  I have that answer.  My additional

24  question is, has the investigation uncovered as a means of

25  identification and linking this event to Christian Begay any

1  information -- not just finding a firearm but any indication,

2  for example, of a blood relative saying, yes, I know Christian

3  has a semiautomatic weapon because he showed it to me last

4  Christmas.

5          **THE COURT:**  Okay.  That's --

6          **MR. TALLON:**  Something like that.

7          **THE COURT:**  -- that's discovery.  That's not -- I'm

8  not sure what communication difficulty you and I are having,

9  Counsel.  If you can't ask a question about probable cause, sit

10 down.  We're not here for discovery this morning and you know

11 it.  I -- how many times have we had this conversation?

12          **MR. TALLON:**  I don't know that I've ever done a

13 hearing in front of you, your Honor.

14          **THE COURT:**  You haven't.  I don't know who you are

15 but I've done hundreds of these types of -- and we don't do

16 discovery on a probable cause.  You ask about probable cause.

17 You're not doing that.  Maybe this is what you do but not in

18 this court you don't.  If you can't ask about probable cause, I

19 don't want to hear your questions.  Do you understand me?

20          **MR. TALLON:**  Yes, I do, your Honor.

21          **THE COURT:**  Then ask questions that you're allowed to

22 ask today.  Okay?

23          **MR. TALLON:**  Yes, your Honor.

24          **THE COURT:**  Do it.

25          **MR. TALLON:**  I have no further questions, your Honor.

1          **THE COURT:**  Sit down.  Thank you.

2          **MR. TALLON:**  You're welcome.

3          **THE COURT:**  Do have any --

4          **MR. TALLON:**  I'm sorry?

5          **THE COURT:**  Do you have argument for me?  Do you

6    believe there's not probable cause shown this morning?

7          **MR. TALLON:**  No, I have no argument, your Honor.

8          **THE COURT:**  Great.  Thank you.  I'll find probable

9    cause.  You may be seated, sir.  You may stand down.

10         Is there -- do we -- I think we may have a detention

11   hearing this morning.  Is there anything you'd like to tell me

12   on behalf of your client on the issue of detention?

13         **MR. TALLON:**  No, your Honor.

14         **THE COURT:**  All right.  I'm going to find your client

15   is a flight risk and a danger.  I'm going to hold him in

16   detention pending further order of the Court.

17         Mr. Tallon, is there anything else this morning?

18         **MR. TALLON:**  Not with respect to the case of

19   Christian Begay, your Honor.

20         **THE COURT:**  Thank you.

21         **MS. RAMIREZ:**  Your Honor, may I be excused?

22         **THE COURT:**  You may.

23         **MS. RAMIREZ:**  Thank you.

24      **(This proceeding adjourned at 10:22 a.m.)**

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>December 28, 2016</u>

        Signed                                             Dated

*TONI HUDSON, TRANSCRIBER*